Statement of the Case.
NICHOLLS, J.
Appeals in the two above-entitled causes have been, by consent, ordered to be consolidated and disposed of together. The first suit is brought by Patsy Cole, mother of a boy named Tony Cole, to recover 87,000 as damages for his death, occasioned by the alleged fault and negligence of the defendant company. Plaintiff alleged that the defendant is engaged in the business of transporting natural gas from its wells about 20 miles from Shreveport, and of selling said gas in Shreveport and vicinity, and that for the purpose of carrying and transporting said gas it maintains and operates a pipe line from its wells to Shreveport.
That the gas coming from said wells into said pipe exercises an enormous pressure upon the latter, and that it is necessary for said company to maintain a constant care and supervision over said pipe line in order to avoid serious danger.
That her son, Tony Cole, a child of her marriage with Jeff Cole, now deceased, a farmer boy, 17 years old, who had never been engaged in any other occupation, entered the employ of said company during the month of August, 1907, and was put to work with several other ignorant and inexperienced laborers under the control and direction of one J. W. Jolly, the foreman of said gas company’s field operating force, and its employe as such, to look after said pipe line, to keep it in good condition, and to make repairs thereon.
She shows that her son was never instructed or warned of the fact that the gas does exert a tremendous pressure on said pipe and that the work was thereby rendered dan *774 gerous, nor was he apprised, instructed, informed, or warned of the fact that escaping gas, when mixed with air, becomes highly explosive, which she alleges now to be a fact.
That on September 26, 1907, the gang of workmen, of-which her said son was a member, was taken by its foreman, said Jolly, to a place on said pipe line about a mile east of Blanchard, in this parish, where it had been discovered that a crack had been caused in one section of the pipe from the pressure of the gas; and by the orders, instructions, and commands of said Jolly her son was put to work to heat and bend another section of iron piping for the purpose of substituting it in the pipe line in place of the défective section, and put the new one in its place.
That, to order to do this work, it was necessary to heat the new section to an intense heat so that it could be properly bent, and that this work of heating the new section and cutting out the old and substituting the new, section was to the knowledge of said company, its officers, agents, and employés, and especially its foreman., an experienced man in this kind of work, exceedingly dangerous unless proper precautions were observed to prevent accident and danger; but that, with proper precautions and due care on the part of the foreman, the work could have been done with safety. She shows, however, that her said son was never warned or instructed in any manner that the work was or could become dangerous, and that he could not have known this without warning.
That under the express command of said foreman, the said laborers built a fire a few feet from said pipe line, and after having heated the new section, which was to be put into the pipe line, to the requisite heat, they both bent the pipe into proper shape and put it down near the pipe line at the place designated by said foreman.
That its said foreman then sent two of his laborers to shut off certain valves which controlled the pressure of the gas, so that the gas might be cut off until the defective section could be taken out and the new one inserted, the upper of said valves being a distance of over five miles from the place of work.
That, about 20 or 25 minutes after said laborers had gone to shut off the valves (a space of time entirely insufficient for them to arrive at the required place) said Jolly ordered petitioner’s said son and some others of the gang of laborers to get into the ditch where the pipe line lay, and to cut said defective section out and to put it up.
That acting on said orders and command, and relying upon the foreman’s superior knowledge and judgment and protection, and without knowing of the danger involved, her said son obeyed said command, and that, as soon as said pipe had been raised, the gas escaped therefrom in great volumes and with immense pressure, beqame mixed with the surrounding air, came into contact with the fire near the line, and exploded.
That her said son was painfully burned all over his body and injuries thereby inflicted from which he died in a few hours in great agony.
That said company was guilty of gross carelessness and negligence in attempting to do an exceedingly dangerous work without using proper precautions against danger; that it was guilty of gross fault in not warning its inexperienced servants of the great danger inherent in the work, and the manner of avoiding same; that it was negligent in taking the pipe loose with any pressure of gas therein; that it was guilty of gross and criminal fault in making its laborers uncouple the pipe with a fire in close proximity thereto, and especially was its foreman guilty of criminal fault in making the laborers do this work without first ascertaining positively that there was no gas pressure therein; and that said company was at fault, and is legally *776 accountable for the injury in ordering and commanding these laborers to do the aforementioned work in the manner in which it was done, and without furnishing them a safe place to work in.
That for his pain and intense suffering her said son would have been entitled, had he survived, to have recovered of said company, the sum of $4,000, which right of action has survived in her favor.
That her son, a laborer, was a good and faithful son, and was her sole support and that of her minor children, of which support she has been deprived by his untimely death.
That she has been deprived of his comfort, society, and affection, and that she has suffered great grief, mental agony and distress, which cannot be adequately repaired.
That she is entitled to recover of said company for the death of her son, at least the sum of $3,000.
In view of the premises she prays that the said Louisiana Gas Company be duly cited to answer hereto and that after all legal delays and due proceedings had, she have judgment against it in the full sum of $7,000 with legal interest from date of judgment, and all costs of suit. She further prayed for all necessary orders and for general relief.
Defendant excepted that J. W. Jolly mentioned in plaintiff’s petition, was an independent contractor, and the relation of master and servant did not exist between plaintiff and defendant; that this defendant, by written contract, let out the work of laying and completing said pipe line from the gas wells to Shreveport, La., which said Jolly was working when said injury occurred, at stipulated prices per foot, the work to be done in a “workmanshiplike manner,” the said Jolly to furnish the labor; this defendant reserving no supervision, direction, or control over the work or workmen, thus creating the relation of contractor and contractee, and not that of master and servant, as all of which will appear by said contract, and the bond to secure same annexed hereto and made part hereof, and defendant cannot be held liable for the faults or negligence, if any, of the said contractor in doing said work.
In view of the premises defendant prays that this exception be sustained and plaintiffs’ demands be dismissed with costs.
The court, over defendant’s objection, referred this exception to the merits.
Defendant filed an answer, and subsequently, an amended answer. In the first, under reservation of its exception, it first pleaded the general issue; further answering, it averred that J. W. Jolly alleged in plaintiff’s petition to have been in charge of the work of laying said gas pipe line and for whom deceased was working when the alleged accident complained of occurred, was an independent contractor and the relation of master and servant did not exist between the deceased and defendant; that this defendant, by written contract, let out the work of laying and completing said pipe line from the gas wells to Shreveport, Louisiana, under which contract said Jolly was working when said injury occurred, at stipulated prices per foot; the work to be done in a workmanship-like manner, this defendant retaining no control, supervision or direction over the work or workmen, thereby creating the relation of contractor and contractee, and not that of master and servant between said Jolly and this defendant, and defendant cannot be held liable by the servants of said contractor for his faults or negligence, if any, in doing said work.
It avers that said deceased was never in the employ of this defendant. Further answering it denied that the injury was caused by any negligence on the part of this defendant, or on the part of any one for whom it was responsible, but avers that’the injury to said deceased was caused by his own negligence, and that of his fellow servants.
*778 But in the alternative, if the court should find that it was negligent, it averred, that the negligence of the deceased contributed to said injury, and plaintiff cannot recover.
In view of the premises, it prayed that plaintiff’s demand be rejected and for general relief.
In the second answer it reiterated the allegations of the original answer; further answering, it averred that at the place where the accident occurred is a ravine, and owing to a leak in a pipe it became necessary for the contractor, Jolly, to take out three sections of about 20 feet each, and to replace them with other pipe; that the three sections which were to be inserted were coupled together and' laid across two stumps upon the hill and some distance from the point of the accident, and a fire built between the stumps under the pipe so that the latter would bend down in a manner to give it the proper curved shape to lie across the ravine.
That when the pipe was so bent it was taken to the ravine and placed alongside of the defective sections which were to be removed; that before cutting the pipe Tony Cole, decedent, was ordered to take a shovel back to the fire and put it out and cover it up with earth, and that he was specially cautioned and enjoined to do it thoroughly.
That Dave McBady, one of the haDds, was sent on horseback about four miles to close the nearest “gate” in the pipe line between the break and the wells, and that Silas Handy was sent to close the “gate” about half a mile distant between them and the city of Shreveport; that both were given ample time and that the “gate” towards the wells was closed but that Handy in some manner turned the wrench the wrong way and so left open the “gate” towards Shreveport.
That when the pipe was severed the gas between the break and the “gate” towards the wells shot a jet southward towards town, and this was ignited from the fire or coals which Cole had been instructed to put out and cover up, and which he had failed to do thoroughly.
That the blaze at once extended to the point where the pipe was severed and was carried in a jet northward from the break by the escaping gas from the section of pipe extending towards Shreveport, and that decedent was burned by the blaze from this jet.
That the injury and death of decedent was: due to his own negligence in failing to thoroughly extinguish and cover up the .fire as directed to 'do and to the negligence of Handy in failing to close the “gate” towards Shreveport.
That said Handy was a fellow servant of decedent for whose negligence defendant is-not liable.
In view of the premises, defendant prayed that plaintiff’s suit be dismissed at his costs, and for general relief.
The jury returned a verdict in favor of the plaintiff for $1,500, which the court confirmed by a corresponding judgment.
The demand and pleadings in the second case were substantially the same as those in the first differing from them only in so far as was made necessary from the fact that, in the latter, the plaintiff, as tutrix and in her own behalf, sought to recover damages for the death of her husband, and her children’s father. The jury rendered a verdict in favor of the plaintiff for $2,000, which the court confirmed by judgment.
The defendant in both eases has appealed.
The plaintiffs in both cases have answered the appeal praying for an increase of judgment.
Opinion.
We are satisfied under the evidence that the two men who were killed, and for whose death damages are claimed in the suits be-' fore us, were not employes of the defendant company, but of Mr. Jolly, the contractor, who-constructed the pipe line from defendant’s *780 gas wells at Caddo City to Shreveport. The suits are not directed against the contractor, but against the defendant company, which was the owner of the pipe line at the time of the accident, which was then being worked upon by the contractor and his employes in order to close a leak which had made itself known on the line of pipe. It is charged that there was fault and negligence in the mode adopted for the closing of the leak, and in the execution of the work done for that purpose under Mr. Jolly’s personal inspection and orders, and for this fault and negligence the defendant company is claimed to be legally responsible in damages. Jolly was an independent contractor.
We have no reason to suppose that he was ■employed to construct the line work as a ■dummy interposed by the defendant to relieve it of responsibility to the workman who might be injured while working, laying down or repairing the line.
The general rule is that the servants of an independent contractor must look to him (and not to the person with whom he has contracted) for injuries which they receive through his fault or negligence.
There are some exceptions to this rule, and the counsel of the plaintiffs claim that the facts of this case bring it under one of these exceptions.
They contend that the work which was being done on the pipe line when j:he accident occurred was work which was inherently dangerous in its character and attended with great possible and probable peril to those who would engage in it, and that under the circumstances it was defendant’s duty to have seen that all proper precautions should have been taken by the contractor and that nil proper warnings were given by him to the workmen; that it could not legally free itself from this duty simply by making a contract with some other person to execute the work. It is not charged here that the defendant controlled the contractor as to the means he should adopt in the construction of the line, or in the manner of executing the work in which engaged, but that, on the contrary, when it was its legal duty to supervise and direct him, it abstained from doing so.
There is. nothing intrinsically dangerous in constructing a pipe line to be used for carrying gas from gas wells to a city for consumption. There was nothing in the contract itself which Jolly made for the construction of this particular line which carried with it danger to the public or to the workmen who would be engaged in it.
It appears from the evidence that Jolly laid down the pipe line between the wells and Shreveport, but had not tested his -work to see whether there were any leaks or not in the .line, when the defendant company, which had in the meantime made contracts with customers to supply them with gas, found it necessary to throw the gas into the -pipes in order not to be found in default to their customers.
In view of that fact (Jolly evidently consenting) the gas was thrown into the pipe line under an understanding that the contractor would ascertain what work was needed to be done to the line in order to make it come up thoroughly to the contract. We do not understand that he was relieved from doing this as part of his contract by reason of the fact that the company utilized the pipe line before the contract was thoroughly complete. No harm or injury to any one resulted per se from this condition of things.
After the gas had been run into the pipe under the circumstances stated, it was found that a serious leak existed in the line at a point between the gas wells and Shreveport, and, in pursuance of the understanding to that effect, Jolly undertook to close it. He notified Mr. Leach, who seems to have been *782 the manager of the defendant company, that he intended doing so, and they conferred together as to the time when it was to he done.
Leach, as a witness, testified that:
“Being in the gas business, he had in the course of such business been called on to put in a section or joint of pipes, where one breaks, or something else — fix places where there were leaks — that it was not practical to locate the leaks with any accuracy where a line is just being put together without putting the gas into it; a person cannot tell by looking at a joint whether it is gastight or not, and the only way one can tell is to put the gas in it and you can hear the gas escaping; when there is gas in the line there is but one way to do it — to cut the line, if pressure is too high, reduce it. If the pressure is medium, you cut the line and let gas escape so that there is no danger from the pressure; then you disconnect the pipe, cut it entirely in two or unscrew it. It is a common, not an extraordinary, thing to cut the line while there is gas in it — where we have plants running and have gas to supply to consumers we never do it in any other way — there is nothing especially dangerous about taking out a joint of pipe and putting in one even when there is gas pressure in the pipe where it is properly handled.”
He remembered the occurrence when two negroes were hurt. Jolly mentioned it to him. He spoke of having to do this repair work and—
“of course I, looking after this end of it, was very anxious that the gas should not be cut off, on account of making it very inconvenient for the consumers, and I asked whether the gas had to be cut off, and he said he thought not, as he had a gate on each side of where the break was in the line and by having everything ready he could make the connection without cutting the consumers out. There was no reason why it could not have been done with reasonable safety. It has been done many times. There is some expansion to gas. If cut off the supply would continue to flow for some time where there are several miles of pipe. Eighty or ninety pounds would supply a small number of consumers for a long time — it would take some time to empty itself.”
On cross-examination he said he had talked with Jolly about the construction of the lino. 1-Ie had made some suggestions as a gasman would in a general way.
“The work of repairing the pipe line if proper precautions are taken, can be done with reasonable safety. It requires constant foresight. If proper precautions are not taken it is a dangerous piece of work. Jolly spoke to him about 8 o’clock in the morning. He told him one of the pipes was leaking. He just stated he was going to do it, and asked witness about the time of day he was going to do the work, and he replied he supposed about 1 o’clock. Witness asked him if he thought he could do it without cutting, and he said he could get everything ready and repair it very quickly, and witness agreed to that. Witness knew nothing of the accident of his own knowledge. Witness did not tell him how to do it, he did not remember having made a suggestion about that part of it; it was Jolly’s own method of doing it.”
Jolly testified that he employed and discharged his hands. The defendant company had no rights in the matter. He said that he went on and laid down the pipe, and put the joints together in order for the defendant to meet its contracts with consumers with the understanding that he was to go back and make a complete job. The ditches had to be sunk and the pipe submerged and put on clamps to stop the leaks. Of course he could not find the leaks until the gas was turned on — it had to be turned on before he could properly finish the line — it was not practicable for him to finish the line before the gas was put into the pipes. The way was “we screwed the pipes together, put the pipe together, and then turned on the gas pressure against it — then we would go back over it and make a complete job— put the pipe in the ditch and put on clamps where we discovered a leak in the joints— that lasted for a considerable time after the company began to furnish people.” Witness was working continuously for some time afterwards operating under the original contract.
He testified that he had not received any instructions from the company in this case —he used his own judgment. The matter was talked over in the morning. He notified Mr. Leach that he would have to make the repairs some time in the afternoon; that this break was getting worse each day, and it would have to be done because if it was not repaired at once it would break off.
Mr. Leach said, in' substance, that they did not want to be shut off if there was any *784 possible chance to get along without it. Witness told him he was going to fix it — he said if possible, they did. not want to be cut off — ■ he said he preferred to have him wait until after 6 o’clock when the persons using the gas would shut down but witness objected to that. Witness said it was a common practice to repair the line with pressure on it. If there was no fire about there was nothing necessarily dangerous about it — the danger was from smoking or a person carrying matches in his pocket which became ignited by accident.
Mr. Perkins, a witness for the plaintiff, had been in the oil business for 16 years— was familiar with the business. We take the following extract from the report of his examination;
“Q. If you wanted to replace a defective section in a gas pipe line full of gas, and you had to bend the new section of pipe to put it in, how would you proceed?
“A. It would depend upon circumstances, where it was, and where we wanted to bend it, over a valley, or over a hill.
“Q. Suppose that it was in a valley?
“A. In a case of that kind, if the pipe did not have expansion enough I would bend it cold, if I could it would not expand; would put in a piece, reduce the gas, and put the pipe in.
“Q. Would you under any circumstances build a fire nearby the pipe line when the gas was in it?
“A. It would just depend upon the conditions, the condition of the pipe altogether, and what I am going to do. I would not if I was going to have an opening in the pipe.
“Q. If you would go to remove a section and have it open, would you build a fire anywhere around there?
“A. No, sir.
“Q. What have you to say as to the danger involved in and attending the repair of a gas pipe line?
“A. It is very dangerous if not properly handled.
“Q. It is not dangerous if there is no gas in it?
“A. No, sir; but if there is gas in it, it is dangerous at all times when there is a fire anywhere near it.
“Q. What have you to say as to the manner whether or not the work is properly done, if a party in charge of the work in a case like I mentioned would build a fire near the pipe line and then has a whole section of pipe cut out, without first getting rid of the gas in the pipe?
“A. How far was the fire from the line?
“Q. Say anywhere within suppose fifty, sixty, or seventy-five feet?
“A. It would not be safe at all.
“Q. Well, suppose that it was less than that?
“A. There would be as much danger one hundred feet as fifty feet. Of course it would ignite. Of course it would depend upon the amount of pressure and air. If there was a heavy pressure it would carry it further.
“Q. You think that it would be just as dangerous one hundred feet away as it would fifty feet?
“A. Yes, sir; if the pressure was on.
“Q. 1-Iow would you go about exhausting the gas before you would take out the pipe?
“A. If I did not have any release gates, would have to cut it and then break it.
“Q. Would you have a fire anywhere around?
“A. No, sir.
“Q. What would you say of the manner of doing the work, if you had a fire anywhere near?
“A. Would say it was improper or carelessly done, I do not know which.
“Q. You would take the pipe out and exhaust the gas before you build your fire?
“A. Yes, sir.
“Q. But suppose that there was a gate or a valve several miles north of the defective section that was to be taken out, and another gate a short distance south, and both gates were cut off, would it still be dangerous?
“A. If there was not any escape for the gas there would be.
“Q. Would not the pressure be the same?
“A. Yes, sir; if there was no escape for it. In a line of perfect pipe it would stay there forever.
“Q. The pressure would be the same, even if both gates were cut off?
“A. Yes, sir.”
Cross-examined:
“Q. I suppose that it is a very ordinary thing to cut off the gas from both directions and take out a section of pipe and put in another section where it is necessary?
“A. Yes, sir.
“Q. Where there is no fire around there is nothing necessarily dangerous in such an -operation?
“A. There is a certain amount of danger when there is gas in the pipe.
“Q. What danger is there?
“A. In cutting the pipe, a piece is liable to fly off and strike a man, when it is under pressure. When you cut a pipe that is under pressure a piece is liable to fly off and strike a man and knock his eye out.
“Q. Did you ever know of anything of that kind to happen?
“A. Yes, sir; seen it happen with the gang of my own.
“Q. You were exercising ordinary care?
“A. Yes, sir.
“Q. It is a very common thing to do it?
“A. No, sir; it' is not a common thing, you do it when working between two gates after you have cut it to let the gas out.
*786 “Q. Even after you shut it off you have to cut the line, and have to take that risk, unless there is some other place to let it out;
“A. Yes, sir.
“Q. So you might say unavoidable risk attending the work?
Y©s sii*»
“Q. It is comparatively a slight danger?
“A. Yes, sir.
“Q. Very seldom happens?
“A. Yes, sir; very seldom happens.
“Q. Suppose if the fire was thoroughly put out there would be no danger of anything like that happening? ' .
“A. No, sir; not any more than the danger ot handling the pressure on the line.”
We have examined the testimony in the record with a view of ascertaining from it what fact, if any, would cause this case to fall as an exception to the general rule that the servants of an independent contractor who are not entitled to damages for injuries received from the fault or negligence of their own employer, from the party whom their employer had contracted? In our opinion we have found no such fact.
This being the conclusion reached it is useless to examine and discuss what the legal situation would be as between the plains tiff and Jolly, for, conceding that he was guilty of fault and of negligence, that fact would be irrelevant in the present suit.
We discover nothing in the present situation by reason of which fault or negligence on the part of the contractor would throw upon the defendant company legal liability to his servants for such fault or negligence from which they have been injured.
Nothing which required defendant to have taken direct control of and supervision over the contractor as to the plan he would pursue to carry out his contract or as to measures he would take to execute it in safety.
The fact that subsequently to entering into his contract Jolly became a stockholder in and secretary-treasurer of the defendant company, and was such at the time of the accident, did not affect the legal situation, nor did the fact that the money with which the workmen were paid was received weekly by him from the defendant company, it was paid to him as money due to him on his contract and not as money due the workmen for their wages; had Jolly after receiving the money applied it to some other purpose than paying the men, they would have had no recourse upon the company for payment of their wages — they were not its employes..
The evidence shows there was a way in which the work could be executed in safety.
The proximate cause of the accident was the presence in the neighborhood of the leak of a fire partially unextinguished with which the gas escaping from the joints being taken out came into contact, causing an explosion. Without the presence of such a fire at that time there would have been no accident. Defendant had no reason to suppose that such a condition of things would arise or that the contractor would not take all necessary and proper precautions.
Eor the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the verdict of the jury in each of the two cases, and the judgment of the court in each of the said cases herein appealed from, be and the same are hereby annulled, avoided, and reversed, and the demands of the plaintiff in each of said two cases be, and they are hereby, rejected and their suits dismissed.