## LITTON v. NATCHITOCHES OIL MILL, Inc., et al.

### No. 6096.

Court of Appeal of Louisiana. Second Circuit.

Feb. 7, 1940.

Rehearing Denied March 6, 1940.

Writ of Certiorari and Review Denied April 29, 1940.

Theus, Grisham, Davis & Leigh, of Monroe, for appellants.

Hunter & Neilson, of Alexandria, for appellee.

HAMITER, Judge.

A Chevrolet truck-tractor and attached five-ton trailer, loaded with cottonseed and occupied by Robert L. Litton and his son, Lester Litton, collided during the morning of December 7, 1937, with a Dodge sedan owned and operated by C. J. Richardson.

The accident, which occurred on the Jefferson Highway in Grant Parish, Louisiana, resulted in the deaths of both of the Littons. The cottonseed was being transported from Alexandria, Louisiana, for and to its owner, the Natchitoches Oil Mill, Inc., at Natchitoches, Louisiana.

Recovery of damages from the said C. J. Richardson and his insurer was denied Mrs. Dovie Litton, the wife of R. L. Litton and the mother of Lester Litton, in two ex delicto and recently terminated actions that she prosecuted. Litton v. Richardson, La.App., 188 So. 439; Id., La.App., 188 So. 442.

In this cause, Mrs. Litton invokes the provisions of the Louisiana Employer's Liability Act, Act No. 20 of 1914, and seeks awards thereunder for the loss of her husband and son. She sues in her individual capacity and as natural tutrix of her minor children, and impleads the Natchitoches Oil Mill, Inc., hereinafter referred to as Oil Mill, and the Central Surety &.Insurance Corporation of Kansas City, Missouri, its compensation insurer. The theory of the action is, and plaintiff alleges, that Robert L. Litton and Lester Litton were employees of the Oil Mill and were acting in the course and scope of their employment at the time of said accident.

Defendants filed exceptions of misjoinder and of no cause and no right of action, a plea of estoppel and a motion to elect. All were overruled by the district court. They are not seriously urged here and, therefore, we give no consideration to them.

The joint answer of defendants contains a denial that plaintiff's husband and son were employees of the Oil Mill. Affirmatively, it is shown that they conducted the business of common carriers or public draymen and enjoyed the status of independent contractors.

A trial of the merits was had on the issues thus created, and there was judgment condemning defendants, in solido, to pay to plaintiff, for the death of her husband, the sum of $14.04 per week for a period of 300 weeks beginning September 7, 1937, with five per cent per annum interest on each weekly installment from its maturity until paid, and also the amount of $150 for funeral expenses. The demands for the death of Lester Litton were rejected, the trial judge stating in his written opinion that there was no agreement existing between that decedent and his alleged employer.

Only the defendants appealed. Plaintiff urges the affirmance of the judgment. Therefore, the demands concerning the deceased son are not before us for consideration.

The question presented by the appeal is whether the relationship of R. L. Litton with the Oil Mill was that of an employee or of an independent contractor within the contemplation of the Workmen's Compensation Statute of this State.

The facts of the case are revealed by an agreed stipulation of counsel and by the uncontradicted testimony of several witnesses. No dispute as to them exists.

The Oil Mill, whose domicile is in Natchitoches, Louisiana, owns fifteen cotton gins in this state. One of these, known as the Independent Gin, is located at Alexandria, Louisiana. The seeds separated from the cotton in the ginning process are transported from the various gins to Natchitoches and there manufactured into cottonseed products. The hauling is performed primarily by trucks owned and maintained by the Oil Mill; however, because of the inadequateness of its fleet, assistance is obtained from ten or twelve other operators of trucks.

These operators furnish their trucks, stand all necessary expenses, and are paid $2 for each ton of seed hauled. No agreement respecting the making of a definite number of trips is obtainable from the Oil Mill. The applicants for hauling are numerous and a division of the work among them is desirable and is attempted. An operator ascertains whether or not he is to be permitted to transport a load by telephoning the gin office or by appearing there.

At the Independent Gin there are six separate places from which the seeds may be secured, and the operator is usually permitted to select his loading location; however, if hot seeds are on hand he is instructed and required to haul these. All transporting must be done in the daytime, unless an emergency exists such as the presence of hot seed, and hauling during wet weather is not allowed. The route to be followed to Natchitoches is not stipulated by the Oil Mill; but it does record the operator's time of departure and of his arrival, this being done to insure prompt delivery. The unloading takes place at a designated point, and is performed by labor and machinery of the Oil Mill.

The truck-tractor involved in the accident in question was owned by Lester Lit-

ton, while the attached five-ton trailer, which contained the seed, belonged to the father, R. L. Litton. The latter applied for the licenses on both portions of the unit, and such were issued in his name. Each of the decedents contributed his services in connection with the use of the equipment. All hauling agreements were negotiated by the father; and on receiving payment thereunder, he settled for the expenses incurred, such as oil and gas, and then divided the balance of the funds with his son.

During the latter part of August and on September 2 and 3, all in 1937, the Littons transported cottonseed for another concern. Shortly thereafter, as the evidence indicates, they commenced using their equipment in behalf of the Oil Mill; and they were making their fourth trip for it, with a load estimated at seven tons, when the collision took place on September 7, 1937.

An official of the Oil Mill gives the following testimony relative to an agreement made with the father a few hours before the tragic occurrence: "Litton came down with his truck that morning. I was here myself, and we didn't care to have any seed hauled that day, and so told Mr. Litton, but he said he was here with his truck, and he would like to have at least one load, inasmuch as he was here. We had some idle men at the gin, so I agreed to let him haul a load, and let our men help him load, which was, I believe, about 8:45 in the morning, about that time. I told Litton if I needed him again I would call him up, and not to come for more seed until I did call him, and it was on that trip that he was killed."

The mentioned officer further testifies that the father was to receive two dollars per ton for the hauling, and there was no requirement that the latter personally do the work. He, R. L. Litton, was privileged to obtain assistance, provided it was at his own expense.

The jurisprudence of this state contains numerous cases involving questions very similar to the one here presented.

The employment of the decedent in the case of Dick v. Gravel Logging Co., Inc., 152 La. 993, 95 So. 99, 101, was for the cutting and sawing of logs; and for his services he was paid a fixed price for each one thousand feet. No specific piece of work was agreed to be undertaken. Certain requirements had to be met by him, such as working on designated strips of land, cut-

ting the trees a stipulated distance above the ground, and making them into logs of specified dimensions; and on violation of any of these, his discharge could be effected immediately. The court held that he was an employee, and made, among others, the following observations:

"The right was reserved by the defendant to discharge any workman who violated any of these requirements. It is the right to interfere that establishes the difference between a mere servant and an independent contractor.

* * *

"We cannot agree with the argument that in order to bring the employment of the deceased within the terms of the Workmen's Compensation Act, it must be shown that he received 'wages,' meaning 'a daily rate of pay' under the contract in force at the time of the hiring."

The son of the plaintiff in Burt v. Davis-Wood Lumber Co., 157 La. 111, 102 So. 87, was killed while performing work under an agreement made with the defendant therein. This consisted of hauling and delivering manufactured lumber, using his own wagon and team, for which he was paid at the rate of $3.50 and $4 per thousand feet. The defendant pointed out the kind and character of the lumber to be hauled, and directed the place of delivery and the person to whom the lumber was to be delivered. The existing factual situation prompted the following expressions by the court:

"The defendant had practical control and supervision of the haulers, and the absolute right to say when and what lumber should be hauled, and this carried with it the right and authority to discharge the employee at will.

"We think, under these circumstances, the doctrine of independent contractor has no application. There was obviously no piece work engaged to be performed, there was no particular job to be executed, there was no specified pile, stack, or quantity of lumber to be hauled, but only such as was pointed out and when pointed out by the employer.

* * *

"Nor does the fact that the employee furnished his wagon and team alter his relations with his employer; nor does such fact put the employee in the character of an independent contractor. The circumstance of an employee furnishing his own team or tools could be of significance or

weight at most, in fixing the average weekly wages.

"Of course, if the employee had engaged to haul the output of the mill at so much per thousand, furnishing sufficient teams and wagons, and employing assistants and drivers to do the hauling, a different case might be presented. In such a case it might well be said that the compensation was to cover profit on the investment in the teams and wagons, and not compensation for personal services."

The defense of independent contractor was urged in Felts v. Singletary, La.App., 143 So. 68, 70, decided by the First Circuit, Court of Appeal. The plaintiff therein was injured while hauling defendant's logs in his own truck for two dollars per thousand feet. He was not obligated to transport any definite quantity. It was said by the Court: "It is shown here that several truck drivers were employed by defendant to haul these logs from Barenine to Florenville for shipment to the sawmills. Plaintiff under his agreement furnished his truck, and, like the others, carried these logs for $2 per thousand to where they were unloaded. It is clearly shown that these employees, including plaintiff, had the right to quit work at any time, and, as the converse proposition must be taken as true, defendant, as their employer, had the privilege and authority to discharge them at will. Obviously, plaintiff, under his agreement, had no specified piece of work to perform, no particular job to be executed, which are the usual characteristics of contracts constituting the employee an independent contractor."

Other cases somewhat in point are: Jones v. Louisiana Oil Refining Corp., 3 La.App., 85; Beebe v. McKeithen Construction Co., 5 La.App. 179; Lee v. Mark H. Brown Lumber Co., 15 La.App. 294, 131 So. 697; Moritz v. K. C. S. Drug Co., La.App., 149 So. 244; and Davidson v. American Drug Stores, La.App., 175 So. 157.

■ When the facts of the instant case are considered in the light of the above cited authorities, it appears that R. L. Litton occupied the status of an employee; and compensation was correctly awarded for his death. There was no employment for a specific length of time or for the hauling of a definite quantity of seed. He was permitted to haul only such quantities and kinds of seeds and at such times as the Oil Mill officials directed, and his working from day to day depended entirely on their

will. Existing, therefore, was the right to interfere with and have practical control and supervision over decedent, as referred to in the aforementioned cases.

■■ It is pointed out by defense counsel that the licenses on the Litton equipment authorized its use "for hauling property for hire, charge, or compensation over the highways and bridges of the State of Louisiana", and also that decedents performed hauling for another company shortly before their death; and it is argued that the Littons therefore were partners in the conduct of the business of a common carrier or an independent contractor. These facts do not, in our opinion, affect the legal status of R. L. Litton. Licenses of the mentioned type are required by the State on all trucks used by their owners in hauling property of others for compensation, whether as common carriers or otherwise. Furthermore, the record does not disclose that the Littons hauled alternately for the Oil Mill and the other concern; on the contrary, indications are that there was a definite discontinuance of work for the latter previous to the assumption of hauling for the Oil Mill.

■ The fact that the father and son worked together in the undertaking and shared equally in the net earnings is of no moment. The services required of the father under the hauling agreements that he negotiated could have been performed entirely by him. If he chose to obtain assistance, thereby lessening his work and reducing his remuneration, he was at liberty to do so.

The case of Johnson v. Vincennes Bridge Co., 167 La. 107, 118 So. 820, 821, strongly relied on by defendants, is distinguishable from the instant controversy by reason of the existence of a different factual situation. The agreement of the injured claimant therein provided "that in his own time and in his own way he should unload a specific amount of steel from a particular railroad car and transport it from that point to a specific destination—the bridge site— for a stipulated price per ton." He was not required to unload and haul particular pieces of steel as they were pointed out to him. The obligation to deal with a definite quantity was assumed, and the defendant exercised no supervision or control over his work.

■ The compensation awarded by the district judge was based on a weekly wage earned by Robert L. Litton of $21.60. He

concluded that the father and son would average eight trips per week hauling seven tons of seed each trip. Fifty-six tons transported at two dollars each figures $112. Deducting $68.80 therefrom, this being the estimated depreciation on the equipment and the cost of gasoline and oil for the eight trips, a balance of $43.20 remains. One-half of this amount was the net earnings of each decedent. The evidence in the record reasonably and fairly sustains this conclusion, and it will not be disturbed.

Accordingly, the judgment is affirmed.