Plaintiff was seriously injured on May 15, 1947, while engaged in cutting and hauling logs to the mill of the Burlington Lumber Company. Total disability resulted from the accident because of which he was paid workmen's compensation by the lumber company's insurer, Consolidated Underwriters of Kansas City, Missouri, for thirty-four (34) weeks, at $20.00 per week. Upon cessation of such payments this suit was filed wherein the plaintiff seeks judgment for additional compensation on the theory that he is permanently totally disabled to perform work of any reasonable character.
The suit is resisted by the insurance company mainly on the ground that the relationship between plaintiff and the lumber company was not that of employer and employee, but that of principal and independent contractor. As we have reached the conclusion that this defense is well founded, other defenses need not be here stated. The payments of compensation, it is alleged, were made in error.
The Lower Court rendered judgment for plaintiff as by him prayed. Written reasons were given. Defendant appealed to this Court.
The facts of the case are to no material extent in controversy.
The Burlington Lumber Company operates a sawmill in Caldwell Parish, Louisiana. At the time the accident occurred it depended entirely upon loggers, such as plaintiff, to supply the mill with logs to keep it running.
Plaintiff had associated with him in the business of logging, one J. Neal Netherly. A partnership between them then existed. Prior to February, 1946, the partnership owned some logging equipment and at times delivered logs to the lumber company. In February, 1946, the lumber company sold to the partnership on credit additional logging equipment with the agreement that the partnership would haul logs for it for a period of eight months. It was also agreed that from the price of each thousand feet of logs delivered under this agreement, $2.50 would be deducted and credited *Page 488 
on the indebtedness due on the equipment. At the end of said eight month period the indebtedness had not been entirely paid, but, without any additional agreement, the partnership continued to log for the lumber company and deductions from the price of delivered logs were made and credited on said indebtedness as theretofore.
The mode of operations was on this wise, viz.: The lumber company purchased from different owners standing timber of certain species and sizes, suitable for its manufacturing purposes, paid for same and agreed to cut and remove the timber within a fixed period. Generally, it was stipulated that all trees, measuring twelve (12) inches and over at the stump, were comprehended within the purchases. Thereafter, plaintiff or Netherly would be authorized to cut the timber and haul same to the mill. Of course, they were required to cut and haul all trees included within the contracts of purchase. This was in the interest of the seller of the timber and of the lumber company. In each instance the compensation for cutting and hauling the logs to the mill site was based upon the distance the logs had to be hauled.
In the conduct of its operations, the partnership hired, directed, fixed and paid the wages of its employees and discharged them at will. It bought and paid for oil and gasoline required to operate its equipment and paid repair bills. It determined from weather and ground conditions when to cut and haul logs. It deducted from wages due employees, and paid over the social security tax fixed by law.
The lumber company arranged for compensation insurance on the employees of the partnership, but the partnership paid the premiums.
In the beginning it was understood, tacitly, if not expressly, between the parties, that the lumber company was not obligated to give the partnership continuous logging for any fixed time after the first eight months. This was clearly demonstrated when, on more than one occasion, the partnership was requested to cease delivery of logs because the mill yard was then overcrowded. In those instances the partnership would apply to other mills and secure contracts to deliver logs to them, and when the lumber company herein involved needed more logs, the partnership would again resume deliveries to it, on the basis as it had done previously.
The officers and agents of the mill company exercised no supervision over the logging operations of the partnership. They had not the right to do so and at no time did they attempt to do so. The fact, as is shown, that one of the lumber company's officers, one or more times, went to the scene of timber cutting and required that all trees of the size and species included in the deed to the lumber company be cut "clean" from the land, did not indicate supervision, or attempt to supervise or control beyond seeing to it that the acts of purchases of timber were strictly complied with, and that all the timber bought and paid for by the lumber company was cut and delivered to it. The action of the officers in these respects simply reflects their interest in results, not the means to attain same. We see daily examples of this sort of action in the erection of large buildings and construction of highways. In works of these sorts, a supervisor for the owner or state is constantly on the job to see that plans and specifications are strictly carried out by the contractor. But no one would contend that such supervision transforms the relationship of principal and independent contractor into one of employer and employee.
It is true that each side admits that the other had the right at any time to discontinue business relations (logging) between them, but we are not convinced, in view of the character of such relations, that this right of freedom of action altered the primary relationship between the parties. It should not be overlooked that the working arrangement between the parties was not intended to be a continuous one. The partnership held itself ready at all times to deliver logs to the lumber company, and their business relationship over a period of several months consisted of several contracts. This is evidenced by the fact that a price for delivered logs was re-fixed each time a tract of timber was offered for cutting, such price being dependent upon *Page 489 
the distance the logs had to be hauled. The cutting and hauling of timber from each tract, we believe, served as the object of a separate contract and when fulfilled the business relationship ceased, temporarily at least, and was only renewed when another tract of timber was offered for cutting.
Mr. Cooksey, General Manager of the mill company, was asked if there was anything to prevent the company from "letting out" the partnership, with regard to cutting and hauling logs for it, and he answered: "No, I guess not." He was also asked if there was anything to keep the partnership and plaintiff from quitting the work, "other than that he owed you", to which he answered: "No, not even that, I don't guess". He was also asked: "But if you had desired, you could have run him off?" to which he answered: "Yes, I guess so."
In giving this testimony, we are constrained to believe that Mr. Cooksey meant that each side had the power, not the legal right, to wilfully terminate a contract for the delivery of logs from a given tract of land. Further on in his testimony he was asked if he considered the contracts binding, to which he answered: "Well, yes. I think it was binding. We felt that we were bound, and I am sure he (plaintiff) felt the same way." The following question was also asked him: "He (plaintiff's counsel) also led you by saying that you could lay him off. You said 'yes'. What do you mean?" He answered: "Well, You could stop him for a few days when you have too many logs on hand, and saw some of them up." He was asked: "In other words, just requesting him to slow down his operations?" He answered: "Yes, cut off a truck or something like that." He was asked: "But you would not terminate his contract?" He answered: "No, oh no."
Cooksey was also asked if, after a contract with plaintiff for cutting and delivering logs from a particular tract, he expected full compliance therewith, to which he answered: "Yes, sir."
For the purpose of the Employers' Liability Act, as amended, subsection 8, Section 3, Act No. 85 of 1926, the term "independent contractor" shall be considered to mean: "any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished."
It goes without saying that in practically all contracts between a principal and independent contractor, the former, by brute force or other questionable means, can prevent execution of the contract; and the independent contractor has the power, of course, to recede from his part of the agreement. To compel compliance with valid contracts, or answer in damages for their breach, bonds are required. It seems clear to us that had plaintiff or the partnership refused to execute one of the contracts with the lumber company, and such action caused temporary cessation of mill operations, due to lack of logs, the partnership could have been held liable for the financial loss the lumber company sustained as a result of the breach of the contract. On the other hand, had the lumber company, after making a contract with the partnership for the cutting and delivery of logs from a certain tract of land, refused to accept the logs, after delivery, or in some other way made fulfillment of the contract on the part of the partnership impossible, surely the lumber company could have been held civilly liable for the financial loss sustained by the partnership on that account.
The point is made that there was not a time limit fixed for the removal of the timber from each or either tract of land. This is not always indispensable to the status of an independent contractor. It seems to have been well understood between the parties, whether expressly stipulated or not, that the timber, in each instance, would be cut and hauled to the mill as expeditiously as was practicable. The officers and agents of the company, from experience, knew that the plaintiff and his partner were capable loggers. Plaintiff relies mainly upon the following three cases, viz.: Litton v. Natchitoches Oil Mill, Inc., et al., La. App., 195 So. 638; Collins v. Smith et al., La. App., *Page 490 13 So.2d 72; Nesmith v. Reich Bros. et al., 203 La. 928, 14 So.2d 767.
The first two of these cases were decided by this Court, while the third was decided by this Court and by the Supreme Court on writ of review. We have again read these cases carefully and do not concur in the argument that they are decisive of the case at bar. The facts of these cases are not nearly identical with the facts of the present case. In each the employee was using a truck in the discharge of his duties, but in each it was shown, that he was under the control, and, in a measure, supervision of the employer. The Supreme Court in the Nesmith case was not overconfident in its conclusion that Nesmith was an employee, and not an independent contractor, and said that it could not be distinguished from the Litton case, supra, which the Supreme Court had approved by declining to review same. See page 769 of the opinion in 14 So.2d.
In the interest of brevity, we deem it best not to encumber this opinion with detailed analyses of the facts of these cases. After all, the facts of each case of this character have to be weighed and considered in determining the issues tendered.
The case of Murphy v. Tremont Lumber Co., La. App.,22 So.2d 79, we think more nearly on all-fours with the present case than are the cases cited by plaintiff, supra. We held therein, as reflected from section 4 of the syllabi, as follows: "One who contracted to cut and deliver to lumber company logs of specified kinds, grades, dimensions, etc., from a 20-acre tract owned by company during specified period to be paid for at specified price per thousand feet log scale, and who employed his own workmen and fixed and paid their wages, was an 'independent contractor' and not an 'employee' within Workmen's Compensation Law, notwithstanding contractor was limited to use of one truck and lumber company supervised work as to kind, quality and specifications of timber being cut. Act No. 85 of 1926, p. 113, § 3 subd. 8."
There is one noticeable point of difference in fact between that case and the present one. There, it appears that a period of time was fixed in which the timber cutting was to take place. It is not so here, however. But, as said above, this is not sufficient to transform the relationship of the parties from principal and independent contractor to that of employer and employee.
The case of Ryland v. Harve M. Wheeler Lumber Co.,146 La. 787, 84 So. 55, is virtually on all-fours with the present case. The Court therein held, as shown in the syllabi, as follows: "A person who engages in hauling logs, under a contract at so much per 1,000 feet, and who supplies his own teams, employs and discharges his own labor, and is his own master in the matter of handling his outfit and of the method to be adopted in the execution of the contract, is an independent contractor, and his claim for damages for personal injuries sustained while so engaged is not within the purview of the Employers' Liability Act, No. 20 of 1914."
There was no time limit in which to remove the timber, in that case.
It is argued that in the discharge of the obligations of the contracts, plaintiff performed manual labor, and that this removed him from the status of independent contractor, if he ever had that status.
This point was discussed and passed upon adversely to appellee's contentions in the Murphy case, supra, wherein Hatten v. Haynes, et al., 175 La. 743, 144 So. 483, is cited as authority. Whether or not an independent contractor deems it proper for him to do some manual labor in execution of the contract is a matter that concerns him alone.
It has been held that when all necessary factors are present to constitute the relationship of principal and independent contractor, the fact that the latter is indebted unto the former does not alter or unfavorably affect such relationship. See: Cole v. Louisiana Gas Co., 121 La. 771, 46 So. 801; Crysel et al. v. Gifford-Hill Co., Inc., La. App., 158 So. 264.
It is apropos here to add that the partnership operated three trucks in order to successfully conduct its logging business. It cut and hauled weekly from forty-five thousand (45,000) to sixty thousand (60,000) *Page 491 
feet of logs; and frequently was paid as much as $3,000.00 for two weeks' deliveries. This character and volume of business argue quite forcefully against the contention that the partnership was merely an employee of the one receiving these logs and making payments therefor in the large amounts mentioned.
We are of the opinion that the established facts support the defendant's position; and for the reasons herein assigned, the judgment from which appealed, is annulled, avoided and reversed. Plaintiff's suit is hereby dismissed at his cost.