561 F.2d 1178
 Mary OLSEN, Plaintiff-Appellant Cross Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees Cross Appellants,
v.
ARGONAUT INSURANCE COMPANY, Intervenor-Appellant.
Christine W. CARVIN, Plaintiff-Appellant Cross Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Third Party Plaintiffs
Appellees-Cross Appellants,
v.
TELEDYNE MOVIBLE OFFSHORE, INC., et al., Third Party
Defendants-Appellees Cross Appellants,
v.
ARGONAUT INSURANCE COMPANY, Intervenor-Appellant.
Frank Winston BOOKER et al., Plaintiffs-Appellees,
v.
SHELL OIL COMPANY et al., Defendants-Appellants.
Gordon Davis WALLACE, Plaintiff-Appellant Cross Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees Cross Appellants,
v.
ARGONAUT INSURANCE COMPANY, Intervenor-Appellant.
ARGONAUT INSURANCE COMPANY, Plaintiff-Appellant Cross Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees Cross Appellants.
 No. 75-4019.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 26, 1977.
 
 Wm. P. Rutledge, Lafayette, La., for Olsen, et al.
 Joel L. Borrello, New Orleans, La., for Argonaut Ins. Co.
 Donald A. Hoffman, New Orleans, La., for Pacific Employers Ins. Co.
 John O. Charrier, Jr., New Orleans, La., for Shell Oil Co.
 W. K. Christovich, Charles W. Schmidt, III, New Orleans, La., for Teledyne Movible.
 Francis G. Weller, New Orleans, La., for Wiegand Co. & Thermo-Disc, Inc., other interested parties.
 Patrick T. Caffery, New Iberia, La., for Texsteam Corp.
 W. Eugene Davis, New Iberia, La., for plaintiff-appellant cross appellee.
 Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD, District Judge.*
 FAY, Circuit Judge:
 
 
 1
 The controversy before this court is factually complex and presents some novel questions of law. It pertains to the explosion of an electric water heater in the living quarters on a drilling platform on the Outer Continental Shelf. The question is whether there is liability of the platform owner, Shell Oil Company, to some of those people who were either injured or killed as a result of the explosion. The plaintiffs set forth two theories of liability. First, they contend that Shell is answerable for the injuries which have occurred because it violated certain regulations issued by the Secretary of the Interior pursuant to the authority granted to him by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1334 the violation of which was a direct cause of the plaintiffs' injuries. In the alternative, the plaintiffs contend that the Louisiana Civil Code Art. 2322[1] imposes a form of strict liability on certain owners of buildings,[2] and, as a result, Shell is liable to the plaintiffs regardless of its lack of personal negligence. We hold that Shell is not liable for breach of the federal regulations because the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., does not provide specifically for a civil remedy for violations of the statute or regulations, and because we feel that this is not the type of situation in which a cause of action should be implied or created. See Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We also conclude that it is impossible for us at the present time to rule on the theory of liability based upon Louisiana Civil Code Art. 2322. After an exhaustive study of Louisiana law, we feel that there is no clear controlling precedent from the highest court in that state, and, consequently, we are compelled to certify the issue to the Louisiana Supreme Court.
 
 I. FACTS
 
 2
 On May 6, 1970, a hot water heater explosion occurred aboard a fixed platform owned by Shell Oil Company in the Gulf of Mexico off the coast of Louisiana. The platform was designated as Shell's "C" platform, and drilling was being conducted from the platform by a drilling contractor known as Movible Offshore, Inc. (Movible). The individual plaintiffs in this case are the legal representatives of men killed in the explosion, except for Gordon Wallace who sues for personal injury. The plaintiffs were all employees of Movible.
 
 
 3
 To conduct the drilling operations from the platform, Movible had located its modular and movable drilling rig on the platform. The rig consisted of all equipment necessary to drill a well, including a derrick or mast, drawworks, the very large engines which were necessary to power the drilling equipment, and all normal appurtenances to a drilling operation. In addition, Movible had its modular living quarters on the Shell platform which provided a galley area for feeding the men, sleeping quarters, shower and bathroom facilities, and a lounge area. The living quarters unit was equipped with two electric water heaters. One water heater was located in the galley area, and another was located in the pantry area. These water heaters were Movible equipment and were wholly owned, as was the living quarters unit, by Movible. The modular living unit was fully movable, and when the rig was moved from one platform to another, it was picked up as a unit by a derrick barge and then transported to a new site and secured on a platform in such a way that cutting and burning of metal would be required to remove it.
 
 
 4
 Under the working arrangement in effect between Shell and Movible, two Movible drilling crews consisting of six men each worked opposite shifts so that the drilling rig could be kept in operation 24 hours a day. Shell performed none of the actual operations on the rig and had only one permanent representative there.
 
 
 5
 At the time Movible began drilling for Shell from Platform C or shortly thereafter, Movible took out liability insurance with Pacific Employers Insurance Company (Pacific), an affiliate of the Insurance Company of North America. In addition to providing liability insurance to Movible, Pacific agreed to provide a safety engineering and safety inspection service to Movible. This service was provided largely through one Gilbert Stansbury, a safety and technical representative of Pacific.
 
 
 6
 In connection with the safety engineering and technical service provided by Pacific, Mr. Stansbury was to visit the Movible rig on a quarterly basis. Mr. Stansbury first visited the rig on January 23, 1969, and then he did not revisit the rig until October 7, 1969. On his first visit, Stansbury inspected the water heaters in the company of Movible's toolpusher, a Mr. Desormeaux. At this time, he recommended (among other things) that a pressure-temperature relief valve be placed on the water heaters in question in place of the existing pressure relief valves. Movible failed to accurately follow the recommendation of Mr. Stansbury, although they should have understood the recommendation since prior insurers had made the same or similar suggestions and Stansbury himself had made the same recommendation during inspections of other Movible rigs. Instead of ordering the proper type of "pressure-temperature" relief valve, Movible ordered and installed another pressure relief valve.
 
 
 7
 The valves were replaced on February 3, 1969. Mr. Desormeaux inspected the heaters after the installation of the valves and concluded that "everything looked okay." On October 7, 1969, Stansbury returned to the rig and interviewed another Movible toolpusher who had since replaced Mr. Desormeaux. Mr. Stansbury did not make a visual inspection of the water heater but relied on the toolpusher's assurances that his recommendations had been followed. As a result, Stansbury reported that all his recommendations had been fulfilled.
 
 
 8
 On May 6, 1970, the hot water heater located in the pantry of the living quarters exploded resulting in many deaths and injuries. The trial judge found that the bottom of the hot water heater ruptured as a result of great pressure which built up in the tank. Then, the great explosive force was created when the water in the heater, which was "superheated" to a temperature of above its boiling point of 212o F., instantly "flashed" into steam when freed from the pressured confines of the tank and just as instantly expanded to more than 1,000 times its liquid volume.
 
 
 9
 The trial judge further found that the fact that an improper valve was in use on the heater was a proximate cause of the explosion. All the experts agreed that the pressure valve which Movible mistakenly placed on the hot water heater was not specifically designed for that use. While the exact cause of the explosion could not be conclusively determined, there is no doubt that had a working temperature pressure relief valve been in place, the accident would have been prevented. The recommended type of valve is designed to relieve excess pressure and temperature, both of which contributed to the explosion of the hot water heater.
 
 
 10
 On June 6, 1974, the trial judge entered his opinion with respect to liability in the case. He found that there was no negligence (as all parties admit) on the part of Shell Oil Company; he held that Louisiana Civil Code Act 2322 was inapplicable, and he held that certain regulations of the Department of Interior did not create strict liability as against Shell in the plaintiffs favor in this case. In the same opinion Judge Heebe also held that Pacific Employers Insurance Company was negligent through one of its inspectors (Mr. Stansbury) who failed to reinspect Movible's premises after recommending that the relief valve be changed on the water heater which exploded. The trial judge also found that the Texstream Corporation, the manufacturer of the valve, was not liable. Judgment was entered accordingly.
 
 
 11
 Thereafter, on motion to reconsider his judgment, the trial judge issued another opinion in which he concluded that the inspector for Pacific Employers Insurance Company was not negligent, but that his earlier opinion in all other respects was correct. The court made explicit in this opinion that the cause of the water heater explosion was the negligence of Movible. The net result of this decision, however, is that the plaintiffs recovered nothing. Movible, who was originally a party to the action, had earlier been granted a summary judgment on the basis that the Longshoremen and Harbor Workers Compensation Act made it immune from suit as the employer of the dead and injured men. Movible is presently in the litigation only as a third party defendant to the claim of Shell Oil Company for indemnity. From this final judgment of the district court, the plaintiffs appealed solely against Shell and solely on the basis that Shell is strictly liable to them. Shell then lodged protective appeals against all of the co-defendants and Movible for indemnity purposes. Movible did likewise.
 
 II. BREACH OF THE FEDERAL REGULATION
 
 12
 A. The Plaintiffs' Theory and Shell's Rebuttal.
 
 
 13
 The plaintiffs' theory of recovery is rather simple. They argue that the Outer Continental Shelf Lands Act empowers the Secretary of the Interior to make regulations for operation upon platforms such as Shell's. Specifically, 43 U.S.C. § 1334(a)(1) provides:The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter.
 
 
 14
 The plaintiffs assert that pursuant to this statutory authority the Secretary of the Interior issued the following regulations which are applicable in our controversy:
 
 
 15
 1) 30 C.F.R. § 250.30 Lease Terms, Regulations, Waste, Damage and Safety
 
 
 16
 The lessee shall comply with the terms of applicable laws and regulations, the lease terms, OCS Orders and other written orders and rules of the supervisor, and with oral orders of the supervisor . . . . The lessee shall take all necessary precautions to prevent damage to or waste of any natural resource or injury to life, or property, or the aquatic life of the seas.
 
 
 17
 2) 30 C.F.R. § 250.45 Accidents, Fires, and Malfunctions
 
 
 18
 In the conduct of all its operations, the lessee shall take all steps necessary to prevent accidents and fires. . . .
 
 
 19
 3) 30 C.F.R. § 250.46 Workmanlike Operations
 
 
 20
 The lessee shall perform all operations in a safe and workmanlike manner and shall maintain equipment for the protection of the lease and its improvements, for the health and safety of all persons, and for the preservation and conservation of the property and the environment.
 
 
 21
 It is argued by the plaintiffs that the above regulations are presumptively valid and that they are applicable to our factual situation. They further argue that Shell (as a lessee of submerged land on the Outer Continental Shelf) breached these regulations, and that this breach visits liability upon Shell regardless of whether or not Shell was in fact negligent. In support of this theory of liability, the plaintiffs cite to us Armstrong v. Chambers & Kennedy, 340 F.Supp. 1220 (S.D.Tex.1972), aff'd on other grounds sub nom. In Re Dearborn Marine Service, Inc., 499 F.2d 263 (5th Cir. 1974). In Chambers & Kennedy, the trial court approved a similar theory of strict liability for breach of these regulations. The court stated:
 
 
 22
 This court must interpret the congressional intent and the Secretary's reasons for promulgating the regulations as imposing certain nondelegable duties upon C & K, as the lessee and owners of the platform. The public policy indicated by these legislative and administrative acts are imperative to the common good and protection of our national community. Thus, any violation, even a nonfeasance, of the guidelines set as preventive measures to accidents must expose the lessee to ultimate liability in tort.
 
 
 23
 Id. at 1233, 1234.
 
 
 24
 Shell counters this argument by asserting that the Secretary's regulations are invalid. It contends that the enabling statute gives both the Secretary of the Interior and the head of the department in which the Coast Guard is operating authority to issue regulations,[3] and it was the Coast Guard exclusively that was given the authority to issue safety regulations. Shell specifically contends that:. . . the regulations upon which Judge Singleton relied in Armstrong v. Chambers & Kennedy, 340 F.Supp. 1220 (S.D.Tex.,1972), being the same ones relied upon by plaintiffs in this action (30 CFR 250.45-250.46), if construed as safety and health regulations for the protection of life and property on the offshore platforms so as to create strict liability in the lease owner, so extend and so modify the granting statute, 43 U.S.C.A. 1334, as to exceed the authority granted by the enabling legislation.
 
 
 25
 Brief for appellee at 31. To support this view, Shell delves deeply into the legislative history of the Outer Continental Shelf Lands Act only to emerge without really proving their point. If the legislative history of the statute shows anything, it is merely that nothing was specifically said one way or the other as to whether or not the Secretary of the Interior has the authority to issue safety regulations. It does not necessarily follow, as Shell alleges, that merely because the Coast Guard is given the authority to regulate in the area of safety, other agencies are devoid of this power.
 
 
 26
 Shell, however, does not rest its case solely on the delegation of power theory. In the alternative, they adopt the position taken by the trial court. The trial court held that the regulations were validly promulgated, but were inapplicable to this particular factual setting. The court states specifically:
 
 
 27
 It is true, as a general proposition, that "a civil remedy may be implied for those clearly within the protective realm of legislation or regulations in the public interest." Euresti v. Stenner, 458 F.2d 1115, 1119 (10th Cir. 1972); Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969). See Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285 (1963). The workers in this case were not clearly within the protective realm, however, since it appears that the regulations in question were not meant to apply to the housing module in this case. . . . Both the wording of the statutes and regulations, and the legislative history of the statutes, indicate that the authority of the Secretary of the Interior concerns drilling and operation practices and conservation. . . . The Coast Guard, on the other hand, is given the broad authority to regulate safety practices which, in places other than fixed platforms, is given by the Longshoremen's and Harbors Workers' Compensation Act to the Secretary of Labor. . . . The Court finds that the operation of an independent housing module on a platform is not a production or drilling operation regulated by the Secretary of the Interior but is rather a matter of general platform safety properly supervised by the Coast Guard. . . . Armstrong v. Chambers & Kennedy, 340 F.Supp. 1220 (S.D.Tex.1972), on which the plaintiff relies, concerned implied liability for violations of the Secretary of the Interior's Regulations but in that case the violations in question resulted from oil drilling and storage operations, and they were properly within the reach of the Secretary's regulatory authority.
 
 
 28
 Minute Entry of Trial Court, June 6, 1974. (App. 729-731).
 
 B. IMPLYING CIVIL REMEDIES
 
 29
 In our opinion, neither party touches on the point which we feel is determinative of the legal effect of the breach of these regulations by Shell Oil Company. That is, even if we assume that the regulations were valid and applicable to our factual setting, what, if any, is the legal effect of their being breached by Shell? The trial court touches on the issue in its above quoted conclusions of law when it stated that civil remedies may be implied in certain situations, but the Court erred in concluding that a civil remedy may be extended to one injured by a breach of a statute or regulation which does not specifically provide for such relief as long as the person injured is clearly within the protective realm of the legislation or regulation. The inquiry which must be made before implying a civil cause of action for a person suffering injury as a result of another's conduct in violation of a regulatory statute which does not expressly provide for a civil remedy is not nearly so simple.
 
 
 30
 In 1916, the Supreme Court announced the doctrine of implying private actions in the absence of specific statutory authorization in Texas & Pacific Railway Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). Rigsby, a railroad employee, sought damages for injuries resulting from his employer's violation of the Federal Safety Appliance Act. The Court upheld his recovery while recognizing that the Act did not expressly confer a private right of action. In broad language, the Court stated:
 
 
 31
 A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied . . . .
 
 
 32
 Id. at 39, 36 S.Ct. at 484.
 
 
 33
 This rather unique question of whether a court can or should imply an action for an injured party who has no express statutory remedy has sparked a great deal of legal commentary, and a string of Supreme Court opinions whose main virtues are not consistency of results. The justification for implication most often proffered by courts and commentators is that it merely furthers the goals Congress was seeking to attain when it initially enacted the legislation.[4] Congress may accomplish these goals through regulation or prohibition of specified conduct. Generally speaking, however, these regulations or prohibitions are only as effective as the statutory sanctions behind them, and, unfortunately, Congress must often decide on these statutory sanctions without a prior opportunity to evaluate their practical effectiveness. In contrast, courts are charged with the duty of enforcing the statute on a case by case basis, and have the opportunity to observe the effectiveness of the enforcement mechanisms. Fully aware of this hindsight advantage, the Supreme Court has sanctioned, in limited situations, the implication of private civil remedies.
 
 
 34
 The criteria for courts to apply in deciding whether or not to imply a civil cause of action have gone through numerous changes since the implication doctrine was first recognized in 1916.[5] The Supreme Court's most recent pronouncement on the matter, however, delineates the factors which we must consider in making that decision. In Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court held that a private cause of action for damages against corporate directors should not be implied in favor of a corporate stockholder under 18 U.S.C. § 610 a criminal statute prohibiting corporations from making "a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors . . . are to be voted for." In making that decision, the court stated:
 
 
 35
 In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39, (36 S.Ct. 482, 484, 60 L.Ed. 874) (1916) (emphasis supplied) that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 458, 460, (94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646) (1974) (Amtrak). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 423, (95 S.Ct. 1733, 1740, 44 L.Ed.2d 263) (1975); Calhoon v. Harvey, 379 U.S. 134, (85 S.Ct. 292, 13 L.Ed.2d 190) (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See Wheeldin v. Wheeler, 373 U.S. 647, 652, (83 S.Ct. 1441, 1445, 10 L.Ed.2d 605) (1963); cf. J. I. Case Co. v. Borak, 377 U.S. 426, 434, (84 S.Ct. 1555, 1560, 12 L.Ed.2d 423) (1964); Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 394-395, (91 S.Ct. 1999, 2003-2004, 29 L.Ed.2d 619) (1971); id., at 400, (91 S.Ct. (1999) at 206) (Harlan, J., concurring in judgment).
 
 
 36
 Id. at 78, 95 S.Ct. at 2088.
 
 
 37
 There is no question that the factors enunciated in Cort must control the decision-making process in the case before us, but fully understanding and properly applying these factors is no minor task. Our first step in this inquiry must be to examine briefly the Outer Continental Shelf Lands Act since it would be fruitless to attempt to deal with the Cort criteria without this background.
 
 
 38
 In 1953 Congress enacted the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. This Act asserted United States' ownership of and jurisdiction over minerals in and under the Outer Continental Shelf.[6] It also extended the Constitution and laws of the United States to the shelf lands, and established an exclusive system of mineral leasing on the Outer Continental Shelf. Section 1332 of the Act asserts United States jurisdiction over the Shelf while section 1333 provides that federal law is applicable on the shelf, applying state law only as federal law, and only when not inconsistent with applicable federal law. Section 1334 deals with the administration of leases, and it grants the Secretary of the Interior the authority to promulgate regulations in order to comply with the provisions of the Act relating to leasing. Section 1334 also prescribes criminal penalties for any person knowingly and willfully violating the Act. The rest of the Act, §§ 1335-1343, deals almost exclusively with the leasing system to be applied on the Shelf.
 
 
 39
 Given this brief background, we can now delve deeper into the history and purpose of the Act as we analyze it within the framework of the Cort criteria. The first factor we must consider is whether the injured employees on the platform should be considered "one of the class for whose especial benefit the statute was enacted." The Cort opinion sheds little light on exactly how to handle this factor. On the one hand, there is language to the effect that the factor would be satisfied if the statute created any federal right in favor of the plaintiffs, or if there was any sort of pervasive legislative scheme governing the relationship between the plaintiffs' class (workers on the platforms) and the defendant's class (a lessee of rights to resources on or under the Shelf). Given this interpretation of the criterion, it would most likely be satisfied in our case. Section 1333 of the Act deals with what law to apply in controversies arising on the shelf, and specifically provides that with respect to disability or death of an employee as the result of operations on the shelf, the Longshoremen's and Harbor Workers' Compensation Act shall apply. From this provision alone, it appears that a federal right has been created in the plaintiffs' class. However, a reading of the entire Cort opinion leads one to question whether this is what the Supreme Court meant when it stated that the plaintiff must be in the class for whose especial benefit the statute was enacted. The opinion seems to imply that a cause of action should not be created unless the primary purpose of the Act (or at least one of the primary purposes) is to benefit or protect the workers on offshore oil platforms.[7] If this is the proper interpretation of the Court's language, then this criterion would not be satisfied. A review of the legislative history of the Act outlines specifically the purposes behind the legislation. The House of Representatives Report on the bill stated:
 
 
 40
 The purpose of H.R.5134 is to amend the Submerged Lands Act in order that the area in the outer Continental Shelf beyond boundaries of the States may be leased and developed by the Federal Government. At the present time the Submerged Lands Act merely established that the seabed and subsoil in the outer Continental Shelf beyond State boundaries appertained in the United States and was subject to its jurisdiction and control.
 
 
 41
 There are no provisions for the leasing and development of the area by the Federal Government nor are provisions made for the exchange of State leases for Federal leases in the same area.
 
 
 42
 This bill contains provisions to accomplish those very objectives.
 
 
 43
 H.R.Rep.No.413, 83d Cong., 1st Sess., 2 (1953). The report then proceeded to explain the need behind the legislation:
 
 
 44
 Representatives of the Federal departments, the States, and the offshore operators all urged the importance and necessity for the enactment of legislation enabling the Federal Government to lease for oil and gas operations the vast areas of the Continental Shelf outside the State boundaries. They are unanimously of the opinion, in which this committee agrees, that no law now exists whereby the Federal Government can lease those submerged lands, the development and operation of which are vital to our national economy and security. It is, therefore, the duty of the Congress to enact promptly a leasing policy for the purpose of encouraging the discovery and development of the oil potential of the Continental Shelf.
 
 
 45
 The committee is also of the opinion that legislative action is necessary in order to confirm and give validity to Presidential Proclamation 2667 of September 8, 1945, wherein the President, by Executive declaration asserted, in behalf of the United States, jurisdiction, control, and power of disposition over the natural resources of the subsoil and seabed of the Continental Shelf. Many other nations have made assertions to a similar effect with respect to their continental shelves, and the committee believes it proper and necessary that the Congress make such an assertion in behalf of the United States.
 
 
 46
 Id. at 2, 3. Similar language was used in the Senate Report. In explaining the reasons why jurisdiction needed to be asserted over the Shelf, the Report stated:
 
 
 47
 (T)he discovery of extremely valuable deposits of oil and gas and probably sulfur in the seabed of the Continental Shelf off the shores of the United States, as well as its vast potential as a source for other raw materials, gave rise to the necessity for protection and control of the area and administration of the development of its economic wealth, so essential to our economy in peace or war.
 
 
 48
 S.Rep.No.411 of the Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 7 (1953).
 
 
 49
 There can be no question that the primary purpose for this legislation was to assert United States jurisdiction over the shelf, and to set up a system for the full development of its natural resources. Protection of the workers on the platform, while no doubt a legitimate concern of Congress, was not a motivating force behind the legislation, and, in fact, only became relevant if jurisdiction was asserted. Therefore, it would not be unfair to say that protection of these workers, like protection of the "ordinary stockholder" in Cort, was "at best a secondary concern" of the Act.
 
 
 50
 There is no language in Cort to the effect that all four criteria must be met in order to imply a cause of action. Rather, the Court simply said that several factors were relevant and worthy of consideration. Consequently, it is not necessary for us to decide which of the above interpretations of the "especial benefit" language is correct. We do consider it relevant that protection of these workers was not the motivating force behind the legislation, but we also think that it is important that Congress did feel it necessary to provide certain rights in the Act to these workers.
 
 
 51
 The fact that Congress did specify certain remedies in the Act might, however, indicate an intent by Congress to deny any other type of civil remedy. This result would follow if we were to employ the doctrine of statutory construction known as expressio unius exclusio alterius, and this leads us into the consideration of the second Cort factor:
 
 
 52
 (I)s there any indication of legislative intent, explicit or implicit, either to create a remedy or to deny one?
 
 
 53
 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).
 
 
 54
 Prior to the Cort opinion, the law appeared to be that if "legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies" absent clear contrary evidence of legislative intent. National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (Amtrak). The Cort opinion seems to modify this position somewhat. The statute under scrutiny in Cort provided for criminal sanctions, yet the Court stated that "provision of a criminal penalty does not necessarily preclude implication of a private cause of action for damages." 422 U.S. 66, 79, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). The Cort opinion also differed from Amtrak in that it stated that absence of any intention to create a cause of action in the legislative history would not necessarily preclude implication, although an implicit or explicit purpose to deny such cause of action would be controlling.
 
 
 55
 The controversy before us is significantly different than the facts before the Supreme Court in Cort. The Outer Continental Shelf Lands Act not only provides criminal penalties for violation of the Act (§ 1334(a)(2)), but also provides extensive civil remedies. As previously noted, § 1333(c) provides that the Longshoremen's and Harbor Workers' Compensation Act should apply in cases of disability or death of an employee working on the platform, and § 1333(a)(2) provides the workers on the shelf any remedy which might be available under state law as long as that remedy is not inconsistent with federal law. We feel, therefore, that fewer reasons exist to imply a cause of action in this case than were present in Cort. The workers on the platform potentially have extensive civil remedies,[8] and, keeping in mind that the underlying purpose of implication is merely to effectuate the goals of Congress, we fail to see how implying this additional remedy will significantly further the goals Congress was seeking to accomplish in passing the act. Therefore, a much stronger argument can be made for applying the expressio unius exclusio alterius doctrine here than could be made in Cort, and this argument is strengthened by language in the legislative history of the Act which indicates that the plight of the workers was considered, and that the remedies provided for by the statute were intended to be the sole solution for this plight. Senator Cordon, while presenting the reasons to the Senate for adopting state law in certain situations, explained that "the full development of the estimated values in the shelf area will require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area. Industrial accidents, accidental death, peace and order" present problems requiring a body of law for their solution. Since "as every member of the Senate knows, the Federal Code was never designed to be a complete body of law in and of itself," the Senate Committee decided that state law would have to be referred to in some instances. 99 Cong.Rec. 6962-6963 (1952), quoted in Rodrigue v. Aetna Casualty Co., 395 U.S. 352, 358, 89 S.Ct. 1835, 1838, 23 L.Ed.2d 360 (1969).
 
 
 56
 The language of Senator Cordon, and the extensive civil remedies available to the workers, indicates to us a legislative intent to deny a civil remedy for breach of the Secretary of Interior's regulations. If in fact Congress considered the situation of these workers and set forth specifically the remedies which it felt would adequately deal with the situation (and there is every indication that this is what occurred), then we would indeed be exceeding our authority to ignore their will, and, in effect, legislate our own remedies.
 
 
 57
 This conclusion does not change as we examine the third and fourth Cort criteria. The third factor we are to consider is whether it is consistent with the underlying purpose of the legislative scheme to imply a remedy for the plaintiffs. In applying this factor, the Cort opinion explained that although "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose . . . in this instance the remedy sought would not aid the primary congressional goal." 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975). It is not surprising that the Cort opinion stressed the fact that implying a civil remedy was not necessary to make effective the congressional purpose. In most cases where cause of actions have been implied, it has been done to remedy the inadequacy of the express statutory means of enforcement. See, e. g., J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Gomez v. Florida State Employment Serv., 417 F.2d 569 (5th Cir. 1969). As in Cort, we fail to see how it could be argued that the remedies available to the workers in our case are inadequate. Nor do we feel that it is necessarily consistent with the legislative goal of the Act (to fully develop the natural resources of the Shelf) to impose liability upon a lessee based upon violation of a departmental regulation when that lessee is admittedly free from fault.
 
 
 58
 The final factor which Cort commands us to consider is whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law. From what we have previously stated, it is apparent that Congress, at least, felt that state law should govern this sort of controversy. Congress reached this conclusion not solely because there are "gaps" in the Federal Code, but also because it recognized that the individual states had a very real interest in the workers on these platforms. As Senator Long pointed out in his minority report to the Senate:
 
 
 59
 A typical individual employed in operations in the shelf area will maintain his family in one of our coastal parishes; he will own or be buying his house and an automobile there. His children will attend Louisiana schools. If either he or a member of his family becomes ill, he will be cared for by a Louisiana doctor in a Louisiana hospital. After his employment in the shelf ends, he will continue to live in Louisiana and will spend his old age there.
 
 
 60
 The children of these employees will attend a free public school, and be provided with free schoolbooks, supplies, lunches, and transportation. Our highways and streets will be traveled by both employer and employee. The State provides charity hospitals for the indigent sick. Care for those stricken with tuberculosis or mental diseases is provided by State-operated hospitals. A State-financed medical school now provides many of the doctors who will minister unto these people. The worker's person and property will be protected by our police. He will be protected from disease and sickness by our public health and sanitation offices. His elderly parents are likely to be receiving a pension during their period of nonproductivity.
 
 
 61
 Louisiana provides a system of courts in which the employee will litigate many of his claims.
 
 
 62
 Many of these same services will be provided for the oil company whose base of operations will be necessarily on Louisiana soil. The company will use our highways, will benefit from police protection, and make use of our courts.
 
 
 63
 None can deny that the furnishing of such services to the thousands of shelf workers, their families, and the companies for which they work will be a heavy financial burden on the State and its subdivisions.
 
 
 64
 S.Rep.No.411 of the Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 66, 67 (1953). We think that it is apparent, therefore, that this controversy should be controlled by state law. The concern of the state for these workers is real, and this concern was recognized and provided for by Congress in the actual provisions of the Act.
 
 
 65
 We are aware of the fact that brevity is not the chief attribute of this decision. We have gone to some lengths to explain our holding because of the many lives and fortunes involved. Development of the Outer Continental Shelf will continue for generations, and, indeed, seems to be gaining added importance. All involved in these vital activities, employers and employees, have a right to know the "rules". Having reached this point, there is much left to be resolved including the applicable state law.
 
 III. LOUISIANA LAW
 
 66
 Having determined that federal law requires the plaintiffs to look to state law for redress, we now turn to plaintiffs alternative theory that Shell is strictly liable for the injuries sustained pursuant to Article 2322 of the Louisiana Civil Code. Article 2322 provides:
 
 
 67
 The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it,[9] or when it is the result of a vice in its original construction.
 
 
 68
 The text of Article 2322 reveals that several threshold issues must be considered before liability under the Article can accrue. The parties to the appeal have vigorously contested the meaning of "owner", "building", and "ruin" as applied to the facts of this case.[10]
 
 
 69
 The main issue of contention between the parties, however, is the purely legal question of whether an owner of an offshore drilling platform can be held strictly liable pursuant to Article 2322 for injuries sustained by employees of an independent contractor present on the platform for the purpose of conducting drilling operations. The district court denied recovery, holding that an employee of an independent contractor can not recover under Article 2322 unless performance of the work on the owner's premises is intrinsically dangerous.[11]
 
 
 70
 If the theory of the plaintiffs' action against Shell was liability for the negligent acts of an independent contractor under the doctrine of respondeat superior, our task would not be nearly as difficult. In Cole v. Louisiana Gas Co., 121 La. 771, 46 So. 801 (1908), the Louisiana Supreme Court long ago held that:
 
 
 71
 The general rule is that the servants of an independent contractor must look to him (and not to the person with whom he has contracted) for injuries which they receive through his fault or negligence.
 
 
 72
 Id. at 779, 46 So. at 804. An exception to the general rule, as recognized in Cole, will arise if the work is inherently dangerous.
 
 
 73
 The theory of the plaintiffs' action, however, is not that Shell is liable for the acts of its independent contractor under the doctrine of respondeat superior, but rather that Article 2322 imposed a strict statutory responsibility upon Shell to keep the platform and the appurtenances thereto free from ruin. Since the basis of the plaintiffs claim for damages in this case is strict liability, rather than negligence or respondeat superior, our inquiry must go beyond Cole.
 
 
 74
 The district court cited the cases of Vinton Petroleum Co. v. L. Seiss Oil Syndicate, Inc.,[12] and Henson v. Traveler's Ins. Co.,[13] in support of its conclusion that Shell is not liable to the plaintiffs under Article 2322. We are of the opinion that these cases are not dispositive of the issue and that a brief analysis of Louisiana jurisprudence will demonstrate the absence of clear and controlling precedent.
 
 
 75
 Although both Vinton and Henson are cases involving claims under Article 2322, whether these cases support the holding of the district court is indeed uncertain. The Vinton case involved damage to the property of an adjoining property owner and not injury to an employee of an independent contractor. In addition, there is ambiguity in Vinton as to whether the Louisiana appellate court extended the general rule that an owner is not responsible for the acts of an independent contractor to cases involving Article 2322 strict liability.[14]
 
 
 76
 In Henson, an employee of an independent contractor was injured when he stepped in an unattended piling hole at a construction site. Although the injured employee in Henson did assert a claim based upon Article 2322 against the owner of the property, the plaintiffs argue that a simple negligence count was also asserted against the owner. The plaintiffs contend that Article 2322 is inapplicable because a hole in the ground is obviously not an appurtenance of a building within the meaning of Article 2322,[15] and, therefore, the discussion in the case as to the liability of the owner to the injured employee deals with the negligence count.
 
 
 77
 Although we do not go so far as to accept the plaintiffs' interpretation of Henson, we are of the opinion that the holding of the Louisiana appellate court is unclear in light of the fact that there is uncertainty as to whether Article 2322 is applicable to facts in that case. More importantly, the discussion of liability in Henson deals with the issue of whether an owner is responsible under Article 2322 for the negligence of an independent contractor, and not whether an owner can be held strictly liable under Article 2322 for "neglect to repair" as a separate theory of liability independent of any fault or negligence of the contractor.[16]
 
 
 78
 Resolution of the issue of whether Shell is strictly liable to the plaintiffs in this case is further clouded by the case of Temple v. General Ins. Co. of America, 306 So.2d 915 (La.App.1974), cert. denied, 310 So.2d 643 (1975). The Temple Court found that because a subcontractor's employee sustained his injuries while in the process of repairing a building, the ruin did not occur from "neglect to repair" within the meaning of Article 2322.[17] Although the court expressly found that Article 2322 did not apply, the court proceeded to set forth what it deemed to be the determinative issue in a case involving injury to an employee of an independent contractor. The court stated:
 
 
 79
 The question of concern is whether the owner was in control of the premises or the contractor who was performing work of laying the bricks which fell causing injury to plaintiff. The answer appears obvious. Certainly the subcontractor, J. R. McFarland, d/b/a United Masonry Company, had control of the wall as the construction was not complete. A workman was working on the wall at the moment it fell. The evidence shows that a workman was striking the joints of the courses of brick when the newly constructed wall began to fall around him. Such a circumstance does not bring the injured plaintiff within the statutory liability imposed on the owner by LSA-C.C. Article 2322, and Article 670.
 
 
 80
 Counsel has not cited to us any case which holds these codal articles applicable to the construction or repair of a building. We find no liability herein. See, Daroca v. Metropolitan Life Insurance Company, 5 Cir., 121 F.2d 917; and Matthews v. Southern Amusement Company, La.App., 199 So.2d 403 (La.App. 3rd Cir. 1967).
 
 
 81
 Id. at 917, 918.
 
 
 82
 The Court of Appeals in Temple thus placed great emphasis upon control of the premises, an issue not expressly considered in Henson.[18] Furthermore, the emphasis upon control of the premises in Temple is conceptually inconsistent with other Louisiana case law providing that absent an agreement whereby a lessee assumes responsibility, a lessor-owner can be held strictly liable under Article 2322 for injuries sustained by employees of the lessee, regardless of whether actual control of the premises is retained by the lessor. See, e. g., Hornsby v. Ray, 327 So.2d 146 (La.App.1976), cert. denied, 330 So.2d 293 (La.1976); 330 So.2d 319 (La.1976).[19]
 
 
 83
 We have surveyed Louisiana law as presented by the briefs of counsel and as gathered from our own research, and we have concluded that there is no clear and controlling precedent from Louisiana's highest court to resolve several of the issues presented by this appeal. The issue which we perceive as most perplexing is whether Shell has available to it an "independent contractor" defense. We hesitate to accept Shell's argument and its interpretation of the Henson and Vinton cases, because of what appears to be a theoretical inconsistency between the imposition of a strict liability standard on a building owner, and at the same time providing an "independent contractor" defense which developed primarily in response to negligence actions and respondeat superior liability. Because the Supreme Court of Louisiana is the final expositor of Louisiana law, we feel compelled to certify the significant questions requiring state law determination to that court.[20] We perceive these issues to include the following:
 
 PROPOSED ISSUES TO BE CERTIFIED
 
 84
 (1) Whether the owner of an offshore drilling platform can be held strictly liable pursuant to Article 2322 of the Louisiana Civil Code absent the existence of intrinsically dangerous work and absent the exercise of control of the premises when employees of an independent contractor hired by the owner are injured while on the platform by the explosion of a hot water heater located in the living module which caused part of the platform to fall or collapse, and when the employees are on the platform for the purpose of conducting drilling operations and not for the purpose of repairing or constructing the platform or any appurtenances or attachments thereto.
 
 
 85
 (2) Assuming that an owner cannot be held strictly liable to employees of an independent contractor without the existence of an intrinsically dangerous activity, whether drilling for oil on an offshore drilling platform constitutes "intrinsically dangerous work" within the meaning of Vinton Petroleum Co. v. L. Seiss Oil Syndicate, Inc., 19 La.App. 179, 139 So. 543 (1st Cir. 1932), and as applied to Article 2322 of the Louisiana Civil Code.
 
 
 86
 (3) Whether injuries sustained by an employee of an independent contractor are the result of "ruin" of the building within the meaning of Article 2322 of the Louisiana Civil Code, when the fall or collapse of the building is caused by the explosion of a hot water heater attached to the living module of the platform.
 
 
 87
 (4) Whether a modular and movable drilling rig which is attached to an offshore drilling platform in such a manner that cutting and burning would be required to remove it, and which is not owned by the owner of the platform to which it is attached, constitutes an "immovable by attachment" within the meaning of Cothern v. La Rocca, 255 La. 673, 232 So.2d 473, 477 (1970), and as applied to Article 2322 of the Louisiana Civil Code.
 
 
 88
 (5) Whether an owner of an offshore drilling platform can be held strictly liable pursuant to Article 2322 of the Louisiana Civil Code for injury sustained upon the platform, even though ownership of the underlying soil is not vested in the owner of the platform.
 
 
 89
 In accordance with the practice of the court, the clerk will be instructed to seek the cooperation of counsel in formulating the precise questions to be certified. We recognize that there are several issues which have been raised with regards to indemnification that are still unresolved. These issues, however, become pertinent only if liability is placed upon Shell Oil Company. Therefore, we will reserve discussion of these issues until we have completed the certification process and the Supreme Court of Louisiana has had a chance to answer the questions so certified. If they should determine that Shell is liable under Louisiana law, we shall endeavor to answer the indemnification questions as expeditiously as possible. If Shell is not liable these questions become moot.
 
 
 
 *
 District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Louisiana Civil Code Art. 2322 provides:
 The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.
 
 
 [2]
 The Louisiana courts have extended the definition of "buildings" to include oil platforms. See Vinton Petroleum Co. v. L. Seiss Oil Syndicate, Inc., 19 La.App. 179, 139 So. 543 (1st Cir. 1932)
 
 
 [3]
 43 U.S.C. § 1333(e)(1) provides:
 The head of the Department in which the Coast Guard is operating shall have authority to promulgate and enforce such reasonable regulations with respect to lights and other warning devices, safety equipment, and other matters relating to the promotion of safety of life and property on the islands and structures referred to in subsection (a) of this section or on the waters adjacent thereto, as he may deem necessary.
 
 
 [4]
 See, e. g., Comment, Private Rights of Action under Amtrak and Ash : Some Implications for Implication, 123 U.Pa.L.Rev. 1392, 1393 (1975); Comment, Emerging Standards for Implied Actions Under Federal Statutes, 9 U.Mich.J.L.Ref. 294, 296 (1976)
 
 
 [5]
 For example, in Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), the Supreme Court recognized that if an act created a right there must be some method of enforcing it, but also stated that the specification of one remedy in the act would normally be understood to exclude another. Id. at 301, 64 S.Ct. 95. This is the first time the Court applied the rule of statutory construction expressio unius est exclusio alterius to deny implication. In Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the Supreme Court stated a rather liberal rule for vindicating federal rights in an action for damages for violation of constitutional rights. The Court stated that when "federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Id. at 684, 66 S.Ct. at 777. This rather liberal attitude was given a set back in the 1950's when, in a series of three cases, the Court refused to imply a remedy. See T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951)
 In 1964, the Court returned to a more liberal position in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) when it held that a private party could bring a derivative action for the use of false and misleading proxy statements, in violation of section 14(a) of the Securities Exchange Act of 1934. In reaching this conclusion, the Court emphasized the broad remedial purposes of the Act, and concluded that private enforcement was a necessary supplement to effectuate the congressional purpose. In 1967, in Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), the Court reaffirmed its decision in Borak when it held that the criminal sanction of section 15 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 409, was not an exclusive remedy under the statute. The Court articulated a set of three criteria for determining when an implied remedy should be found. First, the expressly provided criminal sanctions must be inadequate to ensure the full effectiveness of the statute. Second, the interest of the plaintiff must be within the protection of the statute. Finally, the injury must be of the type that the statute was intended to forestall. These three criteria, however, were not long-lived as the sole judicial test for implying remedies. In National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (Amtrak), there was a return to a more restrictive attitude about implying civil remedies. The Amtrak Act, 45 U.S.C. § 301 et seq. (1970), expressly provided that only the Attorney General had the right to institute a civil action except in cases involving labor agreements. The Court held that the express provision of the remedy to the Attorney General precluded the inference of a civil action in favor of the plaintiffs absent any clear indication in the legislative history that a right of action should be inferred. The Court also stated that the legislative history evidenced an intent to preclude civil remedies, and that an implied remedy would conflict with the Act's policy of streamlining the processes for eliminating unproductive rail routes in order to save the overall passenger system.
 The only other case of significance subsequent to Amtrak and prior to Cort was Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). This controversy involved whether a right of action by a private party was impliedly created by the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa et seq. The Court's opinion followed the reasoning of Amtrak and denied implication mainly because there was a lack of extrinsic evidence indicating that Congress intended to imply private remedies.
 This Court, not unlike the Supreme Court, has had a less than consistent approach to implying civil remedies. The most oft cited case concerning this issue is Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969). In Gomez, the employers of migratory workers and certain state officials had allegedly violated the Wagner-Peyser National Employment System Act. The workers alleged they had been paid inadequately and subjected to abominable living conditions. The only sanction set forth in the Act was a cutoff of federal grants to the states for programs under the Act. This Court decided that this remedy was wholly inadequate and held that the workers were entitled to additional relief under the Act. In enacting this legislation, Congress was aware of and concerned with the slave-like living conditions of these workers. Chief Judge Brown's opinion in Gomez relied heavily on the fact that the legislative history of the Act, and the regulations promulgated pursuant to it, indicated an intent to confer an interest upon migrant farm workers which would go unfulfilled unless more stringent enforcement standards were implied.
 The liberal approach taken in Gomez has not always been followed by this court. One example is Breitwieser v. KMS Industries, Inc., 5 Cir., 467 F.2d 1391 (1972), in which it was held that the child labor provisions of the Fair Labor Standards Act, 29 U.S.C. § 212, and the regulations promulgated thereto, did not create a private cause of action for damages for wrongful death. The Court's rationale rested mainly on the point that when a substantial remedy is provided for by statute, an additional remedy should not be implied absent a showing that such relief is necessary to implement Congress' intent in enacting the statute. The mere fact that the state workmen's compensation law provided the plaintiff with a minimal recovery ($750 in this case), "does not justify a federal court's creating a new federal remedy based on a statute that gives no hint of such a remedy in a field . . . that has traditionally been left to the states." Id. at 1394.
 
 
 [6]
 Continental shelves have been defined as those slightly submerged portions of the continents that surround all the continental areas of the earth. They are that part of the continent temporarily (measured in geological time) overlapped by the oceans. The outer boundary of each shelf is marked by a sharp increase in the slope of the sea floor. It is the point where the continental mass drops off steeply toward the ocean depths. Generally, this abrupt drop occurs where the water reaches a depth of 100 fathoms or 600 feet. Along the Atlantic coast, the maximum distance from the shore to the outer edge of the shelf is 250 miles and the average distance is about 70 miles. That part of the shelf which lies within historic state boundaries, or three miles in most cases, is estimated to contain about 27,000 square miles or less than 10% of the total area of the shelf. The primary purpose of the Act is to authorize and control the leasing of the remaining 90% of the shelf
 
 
 [7]
 This interpretation is based on two points. First, the Supreme Court made an effort to examine the legislative history of 18 U.S.C. § 610 in order to find the purpose in enacting the legislation, and then concluded that this legislative history "demonstrates that the protection of ordinary stockholders was at best a secondary concern." 422 U.S. 66, 81, 95 S.Ct. 2080, 2089, 45 L.Ed.2d 26 (1975). The second rationale for this interpretation is the actual language used by the Court "is the plaintiff one of the class for whose especial benefit the statute was enacted." Standing alone, this language would appear to mean that unless the primary purpose of the legislation was to benefit the plaintiff, then no remedy should be implied
 
 
 [8]
 The potential remedies available to the plaintiffs in our case include their workmen's compensation recovery (which they received) and any meritorious negligence, strict liability, or contract action which could lie against any party other than their immediate employer
 
 
 [9]
 "Neglect to repair" means failure to keep in repair and does not require a showing of negligence. See Adamson v. Westinghouse Electric Corp., 236 So.2d 556 (La.App.1970)
 
 
 [10]
 Shell Oil Company contends that it cannot be held strictly liable pursuant to Article 2322 because it did not own the modular drilling rig containing the hot water heater which was placed upon the platform, nor did it own the soil upon which the platform was placed. Shell also contends that, in effect, the hot water heater which exploded in this case is not an immovable by attachment within the meaning of Cothern v. La Rocca, 255 La. 673, 232 So.2d 473 (1970), because the hot water heater was not placed on the premises by the owner of the building as required by Article 467 of the Louisiana Code. The Court in Cothern recognized that an appurtenance or an immovable by attachment may be included within the term "building". Shell further argues that the fall or collapse of the drilling rig and platform did not result from "ruin" within the meaning of Article 2322, but rather resulted from the negligence of Movible Offshore, Inc
 The plaintiffs counter by arguing that the drilling rig need not be owned by the owner of the platform in order for Article 2322 to apply, and that the drilling rig is an immovable by attachment within the meaning of Cothern because it was attached in such a way that burning and cutting would be required to remove it. In addition, plaintiffs rely upon Article 464 of the Louisiana Code in support of their contention that the drilling rig is an immovable by attachment. Article 464 provides:
 Lands and buildings or other constructions, whether they have their foundation in the soil or not, are immovable by their nature.
 Article 464 has been interpreted to exclude the requirement that "other constructions" be placed upon the premises by the owner. See Hilltop Bowl, Inc. v. United States Fidelity & Guaranty Co., 248 F.Supp. 572 (D.C.W.D.La.1966); Louisiana v. Illinois Central Railroad Company, 256 So.2d 819 (La.App.1972), cert. denied 260 La. 1136, 258 So.2d 381 (1972).
 The plaintiffs also contend that the "ruin" was catastrophic and was caused by Shell's neglect to repair an appurtenance of the structure. The plaintiffs assert that it is irrelevant that Shell's "neglect to repair" was caused by a breach of duty by Movible Offshore, Inc.
 
 
 [11]
 The Court stated in pertinent part:
 Louisiana law is consistently to the effect that an injury to the employee of an independent contractor, caused by the contractor's negligence, does not impose strict liability on the building owner. Henson v. Traveler's Ins. Co., 208 So.2d 366 (La.App.1968), and cases cited therein. The only relevant exception appears to be where "the contract directly requires the performance of a work intrinsically dangerous, however skillfully performed." Vinton Petroleum Co. v. L. Seiss Oil Syndicate, 19 L.App. 179 (182), 139 So.2d (139 So.) 543, 545 (1932).
 Minute Entry of Trial Court, May 14, 1973 (R. 503, 504).
 
 
 [12]
 19 La.App. 179, 139 So. 543 (1932)
 
 
 [13]
 208 So.2d 366 (La.App.1968), cert. denied, 252 La. 174, 210 So.2d 55 (1968)
 
 
 [14]
 In Vinton, the owner of an oil derrick hired a man named Burton to dismantle the derrick on his property. In the dismantling process, the derrick collapsed causing damage to the adjoining property owner (the plaintiff in this case). The plaintiff asserted a count based upon simple negligence and a count based upon Article 2322. The defendant denied all allegations in the complaint and further alleged that Burton was an independent contractor. The Court in the following sequence, made three findings:
 (1) Burton was not an independent contractor so the landowner could not prevail on the defense to the negligence count.
 (2) The plaintiff sustained his burden of proof under Article 2322 of establishing that the derrick was in a rotten or decayed condition at the time of the collapse.
 (3) Even if Burton was an independent contractor, the defendant landowner would still be liable because the work was intrinsically dangerous.
 The third holding sequentially follows the second holding but logically relates to the holding on the issue of negligence, not the holding on the issue of the decayed condition of the building. If the third holding relates to the first holding, Vinton clearly does not apply the independent contractor rule, and the intrinsically dangerous exception thereto, to Article 2322.
 
 
 [15]
 The plaintiffs in their reply brief reason as follows:
 The only presumption we make here is that the State Appellant Court (sic) could tell the difference between an appurtenance to a building and a hole in the ground; and did make that distinction. Since Article 2322 could not possibly have any play physically or legally, Henson's only theory could be that of simple negligence which was met with the defense of independent-contractor and exclusive-remedy.
 Reply Brief of Appellants at p. 9.
 
 
 [16]
 We perceive this to be the narrow issue which the plaintiffs raise on appeal. See, e. g. Camp v. Church Wardens of the Church of St. Louis, 7 La.Ann. 321, 325 (1852)
 
 
 [17]
 In Daroca v. Metropolitan Life Ins. Co., 121 F.2d 917 (5th Cir. 1941), an employee of an independent contractor was injured while working on the owner's premises. The Court stated:
 Plaintiff was neither a tenant nor a third person lawfully, but accidentally, on the premises nor a passerby. He was a workman engaged in making repairs to the building, employed for the very purpose of complying with the owner's duty to keep his building in repair. As to him there is no doubt whatever the owner was not responsible for any negligence of an independent contractor. Camp v. Church Wardens, 7 La.Ann. 321; Peyton v. Richards, 11 La.Ann. 62; Burton v. Davis, 15 La.Ann. 448; Gallagher v. Southwestern Exposition Ass'n, 28 La.Ann. 943; Robideaux v. Hebert, 118 La. 1089, 43 So. 887, 12 L.R.A.,N.S., 632. It is evident appellant can not recover on his first alleged cause of action.
 Id. at 919. Shell has argued that Daroca is authority for denial of recovery by an employee of an independent contractor pursuant to Article 2322 under all circumstances. The plaintiffs counter by arguing that Daroca may deny recovery only when the employee is on the premises for the very purpose of repairing those premises. See Harrison v. Blueberry Hill, 255 F.2d 730, 733 (3rd Cir. 1958).
 
 
 [18]
 In Camp v. Church Wardens of the Church of St. Louis, 7 La.Ann. 321 (1852), the Chief Justice of the Louisiana Supreme Court stated that an owner was liable pursuant to Article 2302 of the Louisiana Code (the predecessor of Article 2322 and identical in wording) for injuries sustained by an employee of a contractor on the premises. The owner had retained substantial supervisory authority over the work of the employees of the contractor doing the repairs. The finding of liability, however, was not premised upon the control retained by the owner. The Chief Justice stated:
 These provisions are entirely independent of the general rules concerning the responsibilities of masters and employers, and not in any manner connected with their relations, is shown conclusively by their place in the code. These articles are in the same chapter, and follow immediately that which provides for the latter, which is numbered 2299. They are evidently founded in an enlightened view of public necessity. They protect the neighbor; the passenger in the street; and it would be singular, indeed, if the men at work at the building were excluded from their just and salutory operation.
 Id. at 325. Justice Slidell, in his concurring opinion, took a different approach. He emphasized the continuous and active control over the work by the owner. Id. at 326. See also Faren v. Sellers, 39 La.Ann. 1011, 3 So. 363 (1888).
 
 
 [19]
 The plaintiffs have also cited the case of McIlwain v. Placid Oil Co., 472 F.2d 248 (5th Cir. 1973), in support of their contention that Shell be held strictly liable. Although McIlwain is factually similar to the present case, the issue of whether the owner can be held strictly liable to an employee of an independent contractor pursuant to Article 2322 was not considered on appeal. Viewed most favorably to the plaintiffs, McIlwain implies that an owner can be held strictly liable to employees of an independent contractor under Article 2322. McIlwain fails, however, to set forth supportive precedent or rationale, and serves to further render the issue unclear in light of the authorities cited herein
 
 
 [20]
 We recognize the wisdom of utilizing the certification procedure and are merely attempting to stay within the wake of our own Admiral (Chief Judge Brown) who is currently aboard the "S.S. Certification" in route to Georgia, Florida and heavens knows where else. See In Re McClintock, 558 F.2d 732 (5th Cir. 1977); Phillips v. Iglehart, 558 F.2d 737 (5th Cir. 1977). Certification to the Louisiana Supreme Court is provided for by La.Rev.Stat.Ann. § 13:72.1 and Rule 12 of the Rules of the Louisiana Supreme Court